**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IRIS WILKIE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **3:12-CV-580** |
| | : | **(JUDGE MARIANI)** |
| **GEISINGER SYSTEM SERVICES** and | : | |
| **GEISINGER HEALTH PLAN** | : | |
| | : | |
| **Defendants.** | : | |

# MEMORANDUM OPINION

## I. Introduction

Before the Court is Defendants' Motion for Summary Judgment (Doc. 23) on Plaintiff's four remaining claims alleging Defendants violated both Title VII and the Pennsylvania Human Relations Act ("PHRA") when they terminated her employment (Counts I and V) and failed to select her for other positions (Counts II and VI) based on her national origin.[1] The record evidence discloses disputes of material fact which preclude, though barely so, the entry of summary judgment.

Because the Court finds that the parties discharged their initial burdens under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant" and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993). As a result, the central issue here

[1] The parties stipulated to the dismissal of her age discrimination claims in Counts III, IV, VII, and VIII of Plaintiff's Complaint, which the Court approved on April 10, 2013. (Doc. 27).

is whether Plaintiff has "point[ed] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). This formulation of the issue follows the holding of *Fuentes*, where the Third Circuit Court of Appeals stated,

> In particular, we consider the evidence that a plaintiff, who has made out a prima facie case, must adduce to survive a motion for summary judgment when the defendant offers a legitimate reason for its employment action in a "pretext" employment discrimination case. We hold that, to do so, the plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

32 F.3d at 762.

For the reasons set forth below, the Court will deny Defendants' Motion.

## II. Defendants' Statement of Undisputed Material Facts[2]

Plaintiff, a native of Germany, began working for Defendants as a temporary employee in March 1999. (DSOF at ¶¶ 5, 6). In October 1999, Plaintiff applied for full-time employment. (*Id.* at ¶ 7). Her application contained her resume "which illustrated that her entire education, including elementary school, took place in Germany." (*Id.* at ¶ 8; Defs.' Ex.

[2] Part II contains the facts as presented in Defendants' Statement of Undisputed Material Facts ("DSOF") (Doc. 25) and its accompanying Appendix and Exhibits (Doc. 26). Unless otherwise indicated, it contains those facts Plaintiff explicitly admits and those facts the Court deems admitted for the reasons discussed in footnote seven of this Opinion. Part III of this Opinion presents Plaintiff's version of the facts.

B, Doc. 26-2, at ECF[3] 6-8). Defendants hired Plaintiff as a "Telemarketing Representative/ Inside Sales/Group Service Agreement Projection," a position she held until 2005. (DSOF at ¶¶ 9, 13). From 1999 until 2005, her supervisor was John Shemo ("Shemo"). (*Id.* at ¶ 11). Between December 11, 2005 and September 29, 2008, Plaintiff held the positions of Data Control Specialist and Marketing Systems Analyst. (*Id.* at ¶¶ 13, 15).

From September 29, 2008 until her discharge on March 17, 2011, Plaintiff worked as a Call Center Sales Coordinator. (*Id.* at ¶¶ 21, 84). Defendants' Call Center encompassed two departments: "the commercial and small business department and a Medicare department[.]" (*Id.* at ¶ 22). Plaintiff worked in the Medicare department. (*Id.* at ¶ 25). On May 22, 2009, "Joan Niedjaco ['Niedjaco'] began supervising the Medicare department." (*Id.* at ¶ 26). "Joan Niedjaco's direct supervisor was Renee Blasi ['Blasi'], who was the Director of Customer Services." (*Id.* at ¶ 35). Both Niedajo and Blasi are "of German descent." (*Id.* at ¶¶ 27, 36).[4]

According to Defendants, Niedjaco began receiving complaints about Plaintiff's work performance in June 2009. (*Id.* at ¶ 43).[5] Between June 2009 and January 2010, no formal disciplinary action was taken; however, Niedjaco met with Plaintiff to "informally 'coach' and 'mentor' Plaintiff" to help improve her performance. (*Id.* at ¶ 46). On January 19, 2010, Defendants initiated formal disciplinary action pursuant to their progressive disciplinary

---

[3] Aside from depositions, the Court uses the pagination of its electronic filing system for the parties' exhibits, citing those pages as "ECF X".

[4] Plaintiff points out that neither Niedjaco nor Blasi speak German, have ever been to Germany or celebrate any German holidays. (Pl.'s Am. Counterstatement of Facts ("PCSOF"), Doc. 36, at ¶¶ 41, 69).

[5] Plaintiff contends that these alleged complaints were never documented. (PCSOF at ¶ 48).

policy. (*Id.* at ¶¶ 42, 44). Under the policy, "an employee, by way of performance improvement plans, is issued a verbal counseling, a written warning, a suspension and, if performance issues continue, the employment of the employee is terminated." (*Id.* at ¶ 42).

Niedjaco wrote, and Blasi approved, a Verbal Warning which was issued to Plaintiff on January 19, 2010. (*Id.* at ¶¶ 44, 54). On January 21, 2010, Niedjaco met with Plaintiff to discuss the Verbal Warning. (*Id.* at ¶ 47). During the meeting, "Ms. Niedjaco provided Plaintiff with goals and action items that Plaintiff was required to address." (*Id.* at ¶ 49). These requests were subsequently supplemented with a Performance Improvement Plan ("PIP"), which was incorporated into the Verbal Warning. (*Id.* at ¶ 52).

On October 8, 2010, Niedjaco and Blasi met with Plaintiff. (DSOF at ¶ 58; Defs.' Ex. E, Doc. 26-5, at ECF 31). "During the October 8, 2010 meeting, Ms. Niedjaco and Ms. Blasi provided Plaintiff with a copy of her job description and asked her to outline those areas in which Plaintiff felt she needed help." (DSOF at ¶ 59). On December 13, 2010, "Plaintiff was issued a Written Warning, together with a second Performance Improvement Plan, by Ms. Niedjaco." (*Id.* at ¶ 60; Defs.' Ex. B at ECF 21-25). The Written Warning, which was reviewed by Blasi, "identified three areas of concern: (1) commission processing understanding; (2) overdue task monitoring; and (3) communication and judgment skills." (DSOF at ¶¶ 62, 69). "On December 16, 2010, Ms. Niedjaco met with Plaintiff to discuss the contents of the December 13, 2010 Written Warning." (*Id.* at ¶ 70).

Niedjaco wrote, and Blasi reviewed, "a third disciplinary notice - a Suspension Notice" which was issued to Plaintiff on January 26, 2011. (*Id.* at ¶¶ 73, 78). "The January 26, 2011 Suspension Notice contained a third, revised Performance Improvement Plan, which specifically incorporated Plaintiff's prior Performance Improvement Plans[.]" (*Id.* at ¶ 74; Defs.' Ex. B at ECF 16-20). The Third PIP required Plaintiff to meet with an Employee Assistance Program counselor, to be suspended for one day and to be reevaluated. (Defs.' Ex. B at ECF 18; Wilkie Dep., Defs.' Ex. A, Doc. 25-1, at 106:23-107:2).

Pursuant to the Third PIP, Niedjaco met with Plaintiff on February 17, 2011. (DSOF at ¶ 80). In an email to Blasi and Human Resource Generalist Dan Smith ("Smith"), Niedjaco stated, "I feel it was a positive meeting." (Defs.' Ex. E at ECF 69). The email contained "PIP update," which assessed Plaintiff's performance since the Suspension. (*Id.* at ECF 69-73). Although Defendants maintain that "Plaintiff was still having significant performance issues," Niedjaco "noted some improvement in Plaintiff's performance at the meeting of February 17, 2011." (DSOF at ¶ 82). Niedjaco told Plaintiff that they "would reassess in two weeks." (Defs.' Ex. E at ECF 69). Although Niedjaco testified during her deposition that she was "certain" a follow-up assessment took place, she could not recall whether a reassessment occurred or whether it was documented (Defs.' Ex. D, Doc. 26-4, at 77:8-78:3), and Defendants do not appear to provide any such documentation.

Defendants discharged Plaintiff on March 17, 2011. (DSOF at ¶ 84). Niedjaco, Blasi and Smith collectively made the discharge decision. (*Id.* at ¶ 89). Defendants provided

Plaintiff a Termination Notice. (Defs.' Ex. B at ECF 13-15). The Termination Notice, written by Niedjaco, stated:

> Iris received a written warning on December 13th. She was consequently Suspended on January 11th. Since Iris' suspension, she has been given detailed job responsibilities, and has been asked to do her best with the tasks. The tasks are not new, the systems are not new, and I continued to offer coaching.
>
> There have been improvements with the frequency of overdue task monitoring, but not to an acceptable level. Tasks remain overdue, and incomplete.
>
> Regarding the commission processing & understanding, Iris did make a very conscious attempt to document the process. She is open to suggestions and advice, however the process remains undocumented and incomplete. Recent review of commission processing indicates questionable judgment calls regarding sales agent credit approvals.
>
> Iris' judgment skills continue to require coaching. While this may have been acceptable 2 years ago, at this time, considering the coaching which has occurred over the past two years, I have not seen reasonable improvement to prove that this task can be learned.
>
> Iris' performance at this time does not show the required improvement required to continue to work in the capacity of the Sales Coordinator.
>
> A termination of employment is effective, March 17, 2010.

(*Id.* at ECF 13-14).

## III. Plaintiff's Counterstatement of Material Facts

Plaintiff believes Defendants discharged her due to her national origin. (Wilkie Dep. at 63:17-21). Plaintiff was born in Germany. (PCSOF at ¶ 18). She is a German citizen and resident alien of the United States. (DSOF at ¶ 5). Both Blasi and Niedjaco knew

Plaintiff was German, and she was the only person in Niedjaco's department that was "identifiably German." (PCSOF at ¶¶ 3-4, 40, 68).

Plaintiff alleges that Blasi and Niedjaco told her that they were "not fond of Germans." (*Id.* at ¶ 17). She testified during her deposition that Niedjaco referred to Adolf Hitler in the workplace. (*See id.* at ¶¶ 6-7, 11-12, 42). Niedjaco would refer to Blasi as "LH," or "little Hitler." (*Id.* at ¶ 6). Niedjaco "would make jokes about Hitler in meetings" and "in front of other employees." (*Id.* at ¶¶ 11-12). To Germans, "[r]eferences to Hitler are particularly offensive . . . and in some cases illegal for that reason in the nation of Germany." (*Id.* at ¶ 36).

Plaintiff testified that Defendants treated her differently because her primary language was German. Plaintiff alleges that Niedjaco instructed her not to "speak German on personal calls in the workplace." (*Id.* at ¶ 35). "In the summer of 2010[,] Ms. Niedjaco insisted that nearly all of Ms. Wilkie's emails be screened by her before Ms. Wilkie sent them, because her 'English is too bad to write.'" (*Id.* at ¶ 16). Additionally, Plaintiff alleges that Blasi mocked her accent and difficulties with English in an email.[6] (Br. in Opp. at 12; *see* PCSOF at ¶¶ 60-61). In the email, Blasi allegedly characterized "a conversation between Ms. Blasi and the Plaintiff as 'yada, yada' . . . 'stutter, stutter,'' which Plaintiff submits "can easily be interpreted as a direct reference to the trouble an individual for whom

[6] The parties refer to this email in their briefs and statements of fact but do not appear to include the email for the Court's review.

English is not their first language may have converting speech from their native language to English." (Br. in Opp. at 12).

According to Plaintiff, Niedjaco "would look to Ms. Wilkie for advice" when she first became Plaintiff's supervisor in 2009. (PCSOF at ¶ 39). Niedjaco allegedly gave Plaintiff a performance review of "exceeds expectations."[7] (*Id.* at ¶¶ 43, 45). However, Plaintiff suggests that once Niedjaco became acclimated with the department, her attitude towards Plaintiff changed. (*See id.* at ¶ 10). "At one point, Ms. Niedjaco stated to Ms. Wilkie 'I have learned a lot from you, and I don't need you anymore. Germans can go,' while waiving [sic] her away with her hand." (*Id.*).

Plaintiff alleges, "Ms. Niedjaco admitted to Ms. Wilkie that on prior occasions, when she didn't like an employee she was supervising, she would change the employee's job description quickly to make it difficult, if not impossible, for the employee to perform her job." (Br. in Opp. at 2 (citing PCSOF at ¶ 19)). According to Plaintiff, Niedjaco similarly manipulated her work responsibilities to "set [her] up to fail." (Br. in Opp. at 20). First, Plaintiff disputes that her work performance was poor. (*See* PCSOF at ¶¶ 43, 67). She asserts that both Niedjaco and Shemo, her previous supervisor, found that "she performed to expectations and was a good worker." (*Id.*).

---

[7] Defendants argue that Plaintiff misleadingly cites Niedjaco's testimony to support its assertion that Niedjaco had given Plaintiff a positive performance evaluation. (Defs.' Resp. to Pl.'s Counterstatement of Facts ("DRSOF"), Doc. 40, at ¶ 43). However, neither party appears to produce a copy of this performance evaluation, so the Court cannot assess the veracity of Plaintiff's characterization.

Second, Plaintiff argues that Niedjaco initiated the disciplinary actions against her based on unfounded and unverified complaints. (*Id.* at ¶ 48). Third, Niedjaco allegedly assigned Plaintiff tasks that were impossible to complete. (*See id.* at ¶ 34). Fourth, Plaintiff suggests that Niedjaco fired her for subjective and unverifiable factors. (Br. in Opp. at 3; PCSOF at ¶ 55). Finally, "Ms. Niedjaco gave the initial recommendation for [Plaintiff's] termination," even though she "had never given a recommendation to terminate any other employee while working for the Defendant." (PCSOF at ¶¶ 57-58).

According to Plaintiff, she sought alternative employment with Defendants following her termination. Plaintiff claims that she applied for twenty jobs in April 2011 "on the Defendant's internal job search." (*Id.* at ¶¶ 22, 24, 26). One of the alleged applications was for "HR Service Representative 1," a position that Plaintiff stated she was qualified to hold. (*Id.* at ¶¶ 31-32). Despite her applications, Plaintiff claims Defendants did not consider her for these positions. (*See id.* at ¶ 30).

## IV. Standard on Motion for Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). "As to materiality, . . . [o]nly

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993). In employment discrimination cases, the Third Circuit has stated that "[s]ummary judgment is to be used sparingly[.]" *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008)).[8]

---

[8] As an initial matter, Plaintiff relies heavily on *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) to refute many of Defendants' statements of undisputed facts. There, the Supreme Court said, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 530 U.S. at 151 (internal citation and quotation marks omitted).

Under Plaintiff's argument, the Court cannot consider any statements from interested witnesses when evaluating a motion for summary judgment. Taking this argument to its logical conclusion, a court could never consider a defendant's deposition or affidavit because he is an interested party, rendering discovery of a defendant's testimony useless for summary judgment purposes. This takes *Reeves* too far, and this is exactly what the Third Circuit stated in *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) (noting "that in considering a

## V. Analysis

Title VII states, "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, . . . because of such individual's . . . national origin[.]" 42 U.S.C. § 2000e-2(a)(1).[9]

A. Counts I and V: Termination based on National Origin

"Under the familiar *McDonnell Douglas* burden shifting test, a Title VII plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 763 (3d Cir. 2004). "If the plaintiff succeeds, the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Fuentes*, 32 F.3d at 763 (quoting *McDonnell Douglas*, 411 U.S. at 802).

1. *Prima Facie Case*

Whether a plaintiff has made out a *prima facie* case of employment discrimination

> is a question of law that must be decided by the Court. It requires a showing that: (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position.

---

motion for summary judgment the court should believe *uncontradicted* testimony unless it is inherently implausible *even if the testimony is that of an interested witness*") (emphasis added). Moreover, the undersigned has already rejected Plaintiff's interpretation of *Reeves* in *Turner v. Luzerne County*, 2013 WL 791450, at *8 (M.D. Pa. 2013) and *Gazdick v. Solis*, 2013 WL 1909576, at *10 (M.D. Pa. 2013).

Therefore, for those paragraphs in Defendants' Statement of Undisputed Material Facts to which Plaintiff responds by relying on *Reeves*, the Court will deem Plaintiff's "denials" as admissions. As a result, the following paragraphs from Defendants' Statement of Undisputed Material Facts are deemed admitted: ¶¶ 14, 23, 27, 36, 38, 43-46, 52-72, 78-83, 85-92, 94, 115, 117.

[9] The PHRA is interpreted consistently with Title VII. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

The first three elements of Plaintiff's *prima facie* case are uncontested. The parties dispute what the fourth element requires and whether Plaintiff has set forth sufficient facts to satisfy those requirements. Contrary to Defendants' assertion, "a plaintiff claiming discriminatory firing need not prove, to make out a prima facie case, that she was replaced by someone outside the relevant class." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 347 (3d Cir. 1999). "Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class . . . and does not establish that the employer did not fire the plaintiff on the basis of her protected status." *Id.* at 353. Rather, a plaintiff may "meet her prima facie burden by demonstrating generally that 'she was either not hired for [a] position or was fired from it under circumstances that give rise to an inference of unlawful discrimination.'" *Id.* at 357 (quoting *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995)).

Here, the crux of Plaintiff's claim concerns Niedjaco's and Blasi's alleged comments about Germans and Hitler. The parties' discussion of whether Plaintiff can establish a *prima facie* case, however, primarily focuses on potential comparators. Because Plaintiff need not prove that she was replaced by a non-German, it is not necessary for the Court to engage in a comparator analysis. *See Pivirotto*, 191 F.3d at 347.

The Third Circuit has stated "'the elements of that *prima facie* case must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of

illegal discrimination.'" *Doe*, 527 F.3d at 365 (quoting *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996)). Further, "the Supreme Court has cautioned that the *prima facie* requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Considering the evidence in the light most favorable to Plaintiff as well as the light burden she faces at this stage, the Court concludes that Blasi's and Niedjaco's alleged statements constitute sufficient evidence of discriminatory animus to make out a *prima facie* case.[10] *See Sewell v. Hertrich Inv., LTD*, 825 F. Supp. 2d 503, 509, 513-15 (D. Del. 2011) (holding that one comment—"Jamaica[n] people don't like white people"—made by decision-maker was enough to "give[] rise to an inference of discriminatory animus" and sufficient to establish a *prima facie* case of national origin discrimination, despite an absence of comparator evidence).

2. *Pretext*

Plaintiff concedes that Defendants have offered a legitimate, non-discriminatory reason for her discharge. (Br. in Opp. at 10). As a result, the burden of production shifts back to Plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *See Fuentes*, 32 F.3d at 763-64. Plaintiff's

[10] Defendants contend that Niedjaco's and Blasi's alleged statements are stray remarks. (Reply Br., Doc. 39, at 15). However, Defendants' make their stray remark argument at the pretext stage. Accordingly, the Court shall address Defendants' argument in Part V.A.2.

principal basis for believing Defendants discharged her due to her national origin is that

Niedjaco and Blasi allegedly stated they are "not fond of Germans" and that Niedjaco

allegedly made Hitler remarks. (Br. in Opp. at 1). Defendants respond that the alleged

statements, even if proven, "would amount to nothing more than . . . stray remark[s]

unrelated to the decision to terminate Plaintiff's employment and, thus, irrelevant to the

pretext analysis." (Reply Br. at 15).

"Stray remarks by non-decisionmakers or by decisionmakers unrelated to the

decision process are rarely given great weight, particularly if they were made temporally

remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d

509, 514, 545 (3d Cir. 1992) (finding that a partner's comment—that the job "would not be

easy for [Ezold] at Wolf because 'she was a woman, had not attended an Ivy League law

school, and had not been on law review'"—was "too remote and isolated" to prove sex

discrimination because it occurred "before Ezold began her employment at Wolf, five years

before the . . . decision" to deny her a partnership). In order to determine whether stray

remarks are probative of Title VII discrimination, "the Third Circuit established three factors"

to guide a district court's analysis: "(1) the relationship of the speaker to the employee and

[the speaker's role] within the corporate hierarchy; (2) the temporal proximity of the

statement to the adverse employment decision; and (3) the purpose and content of the

statement." *DeCecco v. UPMC*, --- F. Supp. 2d ---, 2014 WL 900224, at *45 (W.D. Pa.

2014) (citing *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1112 (3d Cir. 1997); *Ryder*

*v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)). "These factors must be considered in toto in light of the nature and context in which the comment was made." *Id.* (citing *Keller*, 130 F.3d at 1112-13).

Here, Blasi and Niedjaco were Plaintiff's supervisors, and both played a role in her discharge decision. (DSOF at ¶¶ 26, 35, 89). Niedjaco recommended Plaintiff's termination. (PCSOF at ¶ 57). Plaintiff alleges that Blasi and Niedjaco told her that they were "not fond of Germans" during a meeting in late 2009 (*Id.* at ¶ 17; Wilkie Dep. at 42:20-43:5). During another meeting, Niedjaco allegedly stated that she was "not in favor of Germans." (Wilkie Dep. at 44:11-22). In addition, Plaintiff claims that Niedjaco referred to Hitler in the workplace. (*See* PCSOF at ¶¶ 6-7, 11-12, 42).

Niedjaco acknowledges referring to Blasi as "LH," or "little Hitler." (Niedjaco Dep., Defs.' Ex. D, Doc. 26-4, at 24:10-21). Niedjaco allegedly referred to Blasi as "little Hitler" on at least ten occasions. (DSOF at ¶ 106). Plaintiff also claims that Niedjaco told Hitler jokes. (Wilkie Dep. at 49:16-50:5). On one occasion, according to Plaintiff, Blasi rebuked Niedjaco for making Hitler jokes and informed her that it "would be an HR issue." (*Id.* at 46:12-19).

Although the first factor leans in Plaintiff's favor, as both Blasi and Niedjaco were supervisors who contributed to the termination decision, the record is unclear as to when or in what context the alleged statements were made. Plaintiff testified during her deposition that Blasi and Niedjaco stated that they were "not fond of Germans . . . [i]n 2009 . . . maybe [the] end of the year of 2009." (*Id.* at 42:1-43:5). Defendants initiated formal disciplinary

action against Plaintiff in January 2010. (DSOF at ¶ 44). Construing the facts in the light most favorable to Plaintiff, the temporal proximity between the alleged statements and the initial disciplinary action would be no more than a few months. Regarding the Hitler comments, Plaintiff claims Niedjaco made such remarks on at least ten occasions. (*Id.* at ¶ 106). Although Plaintiff asserts that Niedjaco made Hitler jokes, she could not recall the dates the jokes were allegedly told. (*Id.* at ¶ 110).

The third factor, the content and context of the comments, cuts against Plaintiff. Plaintiff could not recall during her deposition the circumstances surrounding Niedjaco's and Blasi's alleged statements that they were "not fond of Germans." (Wilkie Dep. at 42:1-19). The only detail Plaintiff could remember was that the statements occurred during a meeting with both Blasi and Niejaco present. (*Id.*). There is no suggestion that the statements were made in connection with an adverse employment action.

Similarly, Plaintiff does not appear to allege that Niedjaco's Hitler remarks occurred as part of an adverse employment action or even that they were directed at Plaintiff. The undisputed record reflects that "Niedjaco's husband 'coined' the term 'LH' for Ms. Blasi because Ms. Blasi was very tough with time-off requests." (DSOF at ¶ 108; Pl.'s Am. Resp. to Defs.' Statement of Undisputed Material Facts ("PRSOF"), Doc. 36, at ¶ 108). Moreover, it is undisputed that "Niedjaco did not ever call Plaintiff or refer to Plaintiff as 'Little Hitler' or 'LH.'" (DSOF at ¶ 111; PRSOF at ¶ 111).

In light of the foregoing factors, particularly given that Niedjaco and Blasi were the supervisors who recommended and approved Plaintiff's discharge, the alleged comments—at least the alleged statements about being "not fond of" and "not in favor of Germans"—provide some evidence of discrimination. "Although stray remarks alone are insufficient, they can support a finding of pretext when there is additional evidence to disbelieve the employer's proffered reason." *Kargbo v. Philadelphia Corp. for Aging*, 2014 WL 1632193, at *11 (E.D. Pa. 2014) (citing *Waldron*, 56 F.3d at 502). Even though the comments at issue would be stray remarks, summary judgment is inappropriate since Plaintiff offers additional evidence of pretext.[11]

First, Plaintiff asserts that Niedjaco prohibited her from speaking German. (Br. in Opp. at 16-17). Courts have recognized that "language may be used as a covert basis for national origin discrimination." *Abbasi v. SmithKline Beecham Corp.*, 2010 WL 1246316, at *8 (E.D. Pa. 2010) (quoting *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (internal quotation marks omitted)). According to Plaintiff, "Neidjaco [sic] forbade Ms. Wilkie from conversing with her husband on personal telephone calls in their native tongue, being told all personal phone calls must be done in English." (Br. in Opp. at 16). Citing the Equal Employment Opportunity Commission ("EEOC") guidelines and a case from the Northern

[11] In contending that Niedjaco's and Blasi's alleged comments are stray remarks that "should not be considered in a Title VII pretext case" (Reply Br. at 15-16), Defendants liken the present matter to *Valentin v. Crozer-Chester Med. Ctr.*, 986 F. Supp. 292 (E.D. Pa. 1997). In *Valentin*, the court held, "A supervisor's comment on [the plaintiff's] pronunciation of 'shopping,' more than two years before her termination, does not establish that [the defendant's] legitimate reasons for firing her were mere pretext." 986 F. Supp. at 301. In *Valentin*, "[t]he only evidence [the plaintiff] offered related to her national origin involved stray remarks by supervisors and co-workers[.]" *Id.* In contrast, as stated *infra*, there is additional evidence here that could lead a reasonable jury to find pretext.

District of Texas, Plaintiff asserts, "any blanket policy that prohibits speaking any language besides English on [] work premises at all times, violates the Title VII's prohibition against national origin discrimination." (*Id.* at 16-17 (citing 29 C.F.R. § 1606.7; *E.E.O.C. v. Premier Operator Servs., Inc.*, 113 F. Supp. 2d 1066, 1073 (N.D. Tex. 2000))).

The EEOC has promulgated guidelines governing English-only policies in the work place. 29 C.F.R. § 1606.7. Although the parties do not cite, and the Court is unaware of, any recent[12] Third Circuit cases that discuss § 1606.7, a Nebraska District Court case reviewed the guidelines and discussed their applicability in federal courts. *Reyes v. Pharma Chemie, Inc.*, 890 F. Supp. 2d 1147, 1162-64 (D. Neb. 2012). "The guidelines distinguish between policies requiring employees to speak English at all times or 'only at certain times.'" *Id.* at 1163 (citing § 1606.7).

English-only polices applied at all times presumptively violate of Title VII under the guidelines. *Id.* (citing § 1606.7(a)). "Policies applied only at certain times are permitted, but only where the employer can show the rule is 'justified by business necessity.'" *Id.* (quoting § 1606.7(b)). "Courts have upheld English-only policies enacted to improve employee relations and protect workers from feeling they are being talked about by others." *Id.* at 1165 (citing *Tran v. Standard Motor Prods., Inc.*, 10 F. Supp. 2d 1199, 1210-11 (D. Kan. 1998); *Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 237 (N.D.N.Y. 1999) ("Several courts

[12] *Kania v. Archdiocese of Philadelphia*, 14 F. Supp. 2d 730 (E.D. Pa. 1998) and *Silvestre v. Sera Care, Inc.*, 2002 WL 32341778 (E.D. Pa. 2002) discussed § 1606.7; however, those cases were decided over a decade ago.

have held that an English-only policy designed to reduce intra-office tensions is a legitimate business reason.") (collecting cases)).

With respect to the applicability of § 1606.7, *Reyes* explained,

> [C]ourts are split on how to treat these guidelines. The Ninth Circuit has rejected these guidelines as contrary to the text of Title VII. [*Garcia v.*] *Spun Steak*, 998 F.2d [1480],1489-90 [(9th Cir. 1993)]. A few district courts have accepted and applied the guidelines. *See, e.g., Premier Operator Servs.*, 113 F.Supp.2d at 1073; *EEOC v. Synchro–Start Prods., Inc.*, 29 F.Supp.2d 911 (N.D. Ill. 1999). The Tenth Circuit has taken a nuanced middle approach. *Maldonado v. City of Altus*, 433 F.3d 1294, 1305 (10th Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

890 F. Supp. 2d at 1163.

Here, Defendants do not contest the legal validity of Plaintiff's assertion—that blanket English-only policies are presumptively discriminatory. (*See* Reply Br. at 20-21). Instead, they argue that there is no factual basis for finding that they instituted such a policy. (*Id.*). Defendants note that Plaintiff relies on excerpts from the deposition transcripts of Plaintiff and Niedjaco. (*Id.* at 19-20).

Plaintiff testified,

Q. Were you ever instructed to stop speaking German in the workplace?

A. Yes.

Q. Is German your first language?

A. Yes, sir.

(Wilkie Dep. at 143:21-25).

Niedjaco testified,

Q. When you had issue with her communications, what steps did you take to fix those? What restrictions, if any, did you place?

A. The only restriction about the telephone call was, she used her cell phone and was speaking German. And I received a complaint from someone who was uncomfortable, because they felt that she was mocking them or making fun of them. So I asked her if she would please make her personal phone calls outside of her cubicle. That was the restriction.

Q. Did other individuals make personal phone calls within their cubicles?

A. In my particular department, probably, yeah. We're mostly incoming phone calls. So there wasn't a lot of time for it.

Q. They wouldn't be restricted if they spoke in English for making personal phone calls?

A. They would not be.

(Niedjaco Dep. at 41:9-42:2).

Although the parties do not cite, and the Court is unaware of, any cases from the Third Circuit Court of Appeals discussing how much weight to afford § 1606.7, it is unnecessary to make this determination here. Unlike many cases involving § 1606.7, the present matter does not concern a blanket English-only policy in the sense that it allegedly applied to all employees.[13] *See e.g.*, *Kania*, 14 F. Supp. 2d at 731; *Premier Operator Servs.*, 113 F. Supp. 2d at 1069. There is no allegation that Defendants required all employees to speak English only. (PCSOF at ¶ 51; DRSOF at ¶ 51). Whether Niedjaco

[13] Plaintiff does assert a "blanket prohibition" in the sense that Niedjaco allegedly required Plaintiff to speak English at all times, including during personal calls to her husband. (Br. in Opp. at 16-17).

instituted a restriction, as Plaintiff claims, or made a request that she speak English while in

her cubicle, as Defendants submit, there is no dispute that the action taken was unique to

Plaintiff. (*See* Niedjaco Dep. at 41:12-42:2).

As a result, if Plaintiff can prove that she alone was prohibited from speaking another

language, then such a restriction would be indicative of discrimination. Thus, issues of

material fact exist as to whether Plaintiff was prohibited from speaking German in the

workplace and, if so, whether the prohibition was limited to work-related communications.

The record is simply too unclear for the Court to determine, as a matter of law, that no such

prohibition existed or that, if it did, it was justified by business necessity.

In addition to allegedly prohibiting her from speaking German, Plaintiff claims,

"Niedjaco insisted that nearly all of Ms. Wilkie's emails be screened by her before Ms. Wilkie

sent them, because her 'English is too bad to write.'" (PCSOF at ¶ 16). For the purposes of

their Summary Judgment Motion, Defendants do not dispute that Niedjaco required

Plaintiff's emails to be reviewed. (DRSOF at ¶ 16). Nor do Defendants contest that "the

email restrictions she placed on Ms. Wilkie would have taken additional time out of Ms.

Wilkie's day." (PCSOF at ¶ 50; DRSOF at ¶ 50). Whereas Plaintiff implies that the email

screening was part of plot to "set [Plaintiff] up to fail" (Br. in Opp. at 20), Defendants argue

that Niedjaco "only reviewed Plaintiff's emails as a 'coaching tool' to help Plaintiff with,

among other things, the tone (or perception) of her emails." (DRSOF at ¶ 16). Thus, issues

of material fact exist as to whether the email screening evinces national origin discrimination or was motivated by legitimate, facially neutral business reasons.

Third, Blasi allegedly mocked Plaintiff's accent and difficulties with the English language. "Accent and national origin are obviously inextricably intertwined in many cases." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1195 (9th Cir. 2003). "Discrimination based upon a person's accent may constitute national origin discrimination[.]" *Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, --- F. Supp. 2d ---, 2014 WL 956016, at *5 (D.N.J. 2014) (discussing when accent-based discrimination constitutes national origin versus racial discrimination in the context of a 42 U.S.C. § 1981 claim); *Le v. City of Wilmington*, 736 F. Supp. 2d 842, 855 (D. Del. 2010) *aff'd*, 480 F. App'x 678 (3d Cir. 2012) (differentiating "disparaging remarks about one's language skills and national origin" from situations where "an employee's heavy accent or difficulty with spoken English can be a legitimate basis for adverse employment action where effective communication skills are reasonably related to job performance") (quoting *Yili Tseng v. Florida A & M Univ.*, 380 Fed. App'x. 908, 908-10 (11th Cir. 2010)). "National origin discrimination may arise in a case where a plaintiff suffered from employees mocking her accent, while also being taunted with phrases that specifically acknowledge a person's national origin." *Wesley*, 2014 WL 956016, at *5.

Here, the issue of Plaintiff's accent arises in the context of an email from Blasi to Niedjaco. (*See* PCSOF at ¶¶ 60-61). According to Plaintiff, the email characterizes "a

conversation between Ms. Blasi and the Plaintiff as 'yada, yada' . . . 'stutter, stutter.'" (Br. in Opp. at 12). Plaintiff submits, "This can easily be interpreted as a direct reference to the trouble an individual for whom English is not their first language may have converting speech from their native language to English." (*Id.*). In response, Defendants assert that Plaintiff "simply quotes part of an email, without providing foundation for the same, and presents it out of context." (Reply Br. at 18-19).

While the email in question does not appear to be included in the record, Defendants do not dispute, for the purposes of summary judgment, that Blasi "characterized a conversation with Ms. Wilkie as 'yada, yada' and 'stutter, stutter[.]'" (PCSOF at ¶ 61; DRSOF at ¶ 61). Viewing this in the light most favorable to Plaintiff, and in combination with Blasi's alleged statement that she is "not fond of Germans," a reasonable jury could infer some evidence discriminatory intent.

A fourth factor a reasonable jury could consider is Plaintiff's work history. Plaintiff worked for Defendants for over a decade without any formal disciplinary action being taken against her. Defendants employed Plaintiff from March 1999 until her discharge on March 17, 2011. (*See* DSOF at ¶¶ 6-7, 84). Despite Defendants' assertion that "Shemo was forced to counsel Plaintiff" at one point while he was her supervisor, no formal disciplinary action was taken against Plaintiff until January 19, 2010, after Niedjaco had become her supervisor. (*Id.* at ¶¶ 12, 26, 46). Thus, Plaintiff's work history casts some doubt on

Defendants' stated rationale for her discharge, which was allegedly predicated on poor performance.

Fifth, it is undisputed, for the purposes of summary judgment, that Niedjaco told Plaintiff that she altered the job descriptions of Plaintiff's coworkers, Candice Thomas ("Thomas") and Louise Belnoski ("Belnoski"), "in order to make it difficult for them to keep their jobs." (PCSOF at ¶ 19; DRSOF at ¶ 19). According to Plaintiff, Niedjaco originally "got along well" with Thomas and Belnoski but later told Plaintiff that she did not "like both of them anymore" and that she was "changing quickly the[ir] jobs descriptions." (Wilkie Dep. at 69:14-70:4). Plaintiff testified that Niedjaco added a licensing requirement to Thomas' and Belnoski's job qualifications because she knew they did not have applicable license and would have "to be let go." (*Id.* at 70:5-71:19).

Plaintiff asserts that Niedjaco treated her in a similar fashion. According to Plaintiff, she got along well with Niedjaco initially. However, after Niedjaco became acclimated to the department, "Niedjaco stated to Ms. Wilkie 'I have learned a lot from you, and I don't need you anymore. Germans can go,' while waiving [sic] her away with her hand." (PCSOF at ¶ 10). According to Plaintiff, Niedjaco then took measures to "set [Plaintiff] up to fail by giving [her] additional work and then terminating her when she [could] not finish the tasks she was never asked to do before, on top of the task she had always been performing to [a] level that exceeded expectations." (Br. in Opp. at 20). As a result, Niedjaco's alleged

treatment of Thomas and Belnoski offers some support for Plaintiff's contention that Defendants' stated justification for her discharge is a pretext.

Sixth, there is a gap in the documentation of Plaintiff's disciplinary records that could contribute to an inference of pretext. While the disciplinary actions taken against Plaintiff were documented in emails and PIPs throughout 2010 and early 2011, Defendants do not offer similar documentation for the month immediately preceding her discharge. (*See generally* Defs.' Exs. B, E). Defendants fired Plaintiff on March 17, 2011. (DSOF at ¶ 84). On February 17, 2011, Niedjaco met with her pursuant to the Third PIP. (*Id.* at ¶ 80). In an email to Blasi, Niedjaco characterized the meeting as a "positive" one and indicated that she had told Plaintiff that Defendants would reassess her performance in two weeks. (Defs.' Ex. E at ECF 69). Niedjaco testified during her deposition that she was "certain" a follow-up assessment took place; however, she could not recall whether it occurred or was documented. (77:8-78:3).

Finally, Defendants make several assertions which do not rebut Plaintiff's pretext evidence but are worth briefly discussing. Defendants argue (1) that both Blasi and Niedjaco are of German descent (Br. in Supp. at 25-26; Reply Br. 15, 17), (2) that "Plaintiff and her family have a history of alleging that they have been discriminated against or harassed based upon their national origin" (Br. in Supp. at 27 n.12) and that (3) Plaintiff had a friendly relationship with Niedjaco (*id.* at 27). The implication of these claims is that they

are inconsistent with Plaintiff's assertion that Blasi and Niedjaco discriminated against her based on national origin.

In response, Plaintiff argues that there is "a clear difference between a German national [and] an American who has some German heritage." (Br. in Opp. at 13). Further, Plaintiff submits that "being a member of a class does not preclude one from discriminating against that class." (*Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78-80, 118 S. Ct. 998, 1001-02, 140 L. Ed. 2d 201 (1998)). The Supreme Court has stated, "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Oncale*, 523 U.S. at 78 (quoting *Castaneda v. Partida*, 430 U.S. 482, 499, 97 S.Ct. 1272, 1282, 51 L.Ed.2d 498 (1977)). Therefore, the fact that Niedjaco and Blasi are German-American does not entitle Defendants to judgment as a matter of law. Their heritage, along with Defendants' assertions that Plaintiff was friendly with Neidjaco and that Plaintiff's family has a history of claiming discrimination, may be the basis for arguments at trial, but they cannot form a basis for a grant of summary judgment.

In sum, viewing the record in its entirety and keeping in mind the Third Circuit's admonition that "[s]ummary judgment is to be used sparingly in employment discrimination cases," *Doe*, 527 F.3d at 369, Plaintiff has produced enough evidence, though barely so, to necessitate trial. The Court is mindful that Defendants allegedly discharged Plaintiff in accordance with their progressive disciplinary policy and that, at trial, Plaintiff will need to

convince a jury both that Defendants' proffered reasons for firing her were false "*and* that discrimination was the real reason." *Fuentes*, 32 F.3d at 763 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in *St. Mary's Honor Ctr.*)). However, at the summary judgment stage, Plaintiff need not make this dual showing. *See id.* at 764. It is sufficient that the factors discussed above combine to create a reasonable inference that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of" Defendants' decision to fire Plaintiff. *See id.* Thus, Defendants' Motion for Summary Judgment as to Counts I and V must be denied.

B. Counts II and VI: Failure to Select based on National Origin

After her termination, Plaintiff allegedly applied for alternative employment with Defendants. She asserts that due to her national origin Defendants did not select her for rehire. (Br. in Opp. at 26-28). Defendants argue that Plaintiff failed to adduce sufficient evidence to establish a *prima facie* case of discrimination for her failure to select claims. (Br. in Supp. at 30-32). A plaintiff can establish a *prima facie* case of discrimination under Title VII "by showing (i) that [s]he belongs to a [protected group]; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802.

Defendants assert, "Plaintiff has introduced absolutely no evidence – not even her own subject[ive] beliefs or personal observations – to establish that she applied for even one position with Defendants, let alone twenty (20)." (Br. in Supp. at 32). Despite this, Defendants admit, "for the purposes of summary judgment," that "Ms. Wilkie applied for twenty jobs with the Defendant[s]," including for HR Service Representative 1. (PCSOF at ¶¶ 22, 31; DRSOF at ¶¶ 22, 31). Defendants fail, therefore, to establish that Plaintiff cannot make out a *prima facie* of discrimination for her failure to select claims.[14] Thus, Defendants' Motion for Summary Judgment as to Counts II and IV must be denied.

## VI. Conclusion

For the foregoing reasons, the Court will deny Defendants' Motion for Summary Judgment (Doc. 23). A separate Order follows.

Robert D. Mariani
United States District Judge

[14] Although Defendants' Brief in Support contests only whether Plaintiff can show that she applied for another position (Doc. 24 at 30-32), their Reply Brief appears to raise additional challenges to Plaintiff's *prima facie* case (Doc. 39 at 31). In ruling on a motion, "a district court need not address issues raised for the first time in a reply brief." *Dreyer v. Sheaffer*, 2009 WL 917829, at *3 (M.D. Pa. 2009). That is because "[a] reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues." *United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006) (collecting cases). As a result, the Court does not consider Defendants' Reply Brief assertions that Plaintiff "cannot establish that she was qualified for the position" and "cannot establish that the position remained open and Defendants continued to seek applicants." (Doc. 39 at 31).